SHANNON F. GRAHAM, Plaintiff-Appellant, v. UNITED NATIONAL INVESTORS, INC., d/b/a Lake Club, *et al.*, Defendants-Appellees.

Fourth District    No. 4—00—0600

---

Argued February 14, 2001.—Opinion filed March 20, 2001.

Hugh M. Talbert and Laura A. Cole (argued), both of Talbert & Associates, P.C., of Alton, for appellant.

John R. Keith (argued) and Linda M. Warwick, both of Keith Law Office, of Springfield, for appellee United National Investors, Inc.

Robert C. Bollinger (argued) and Evan H. Johnson, both of Erickson Da-

vis Murphy Johnson Griffith & Walsh, Ltd., of Decatur, for appellee Capital City Brewing Company, Inc.

JUSTICE KNECHT delivered the opinion of the court:

In September 1996, plaintiff, Shannon F. Graham, was involved in an automobile accident after the truck in which he was a passenger left the roadway and struck two trees, causing him to suffer severe head injuries. In September 1997, plaintiff filed a complaint alleging, in count I, the driver of the truck, Aaron M. Pierson, acted negligently in causing the accident and, in counts II and III, liability under section 6—21(a) of the Liquor Control Act of 1934 (Dramshop Act) (235 ILCS 5/6—21(a) (West 1996)) against two bars the parties visited the night of the accident, United National Investors, Inc., doing business as the Lake Club (Lake Club), and Capital City Brewing Company, Inc., doing business as the Atrium (Atrium). No issues regarding the count against Pierson are the subject of this appeal. In June 2000, after finding plaintiff acted with complicity in procuring the intoxication of Pierson, the trial court awarded defendants summary judgment. Plaintiff appeals, arguing the trial court erred as a matter of law by finding plaintiff acted with complicity. We reverse.

## I. BACKGROUND

On the evening of September 4, 1996, plaintiff, Pierson, and Mark Coats embarked in Coats' truck on a "tour of taverns" encompassing three different bars in the cities of Jacksonville and Springfield. While at the Lake Club bar in Springfield, Coats got into an altercation in the parking lot and was later arrested by police. Finding they had the keys to Coats' truck, Pierson and plaintiff drove from the Lake Club only to end up a short time later in a single-vehicle accident after the driver, Pierson, fell asleep and ran off the road. As a result, plaintiff suffered a fractured skull and other injuries. In September 1997, plaintiff filed a complaint in which he alleged, *inter alia*, the Atrium and the Lake Club violated Illinois' Dramshop Act by serving Pierson alcoholic beverages on the night of the accident, causing him to become intoxicated.

In his deposition, plaintiff testified the parties left Beardstown in Coats' truck, with Coats driving, shortly after 10 p.m. and headed for the Headquarters bar in Jacksonville. During the ride, plaintiff testified they were all drinking beers from a cooler located in the back of the truck. Plaintiff said Coats' truck had a sliding center window through which they could reach the cooler from the cab of the truck. He estimated he and Pierson drank approximately three beers each between Beardstown and Jacksonville. The trio stopped briefly in Jacksonville at a bar called the Headquarters but did not go in.

Plaintiff testified they left Jacksonville and headed toward Springfield. Plaintiff and Pierson each drank an additional three beers by the time the trio arrived at the Atrium bar in Springfield. At the Atrium, plaintiff testified, the trio took turns buying rounds for each other as they "danced and drank." Plaintiff estimated he and Pierson each consumed around three shots of a substance known as "liquid cocaine" and about three beers. Later in the evening, the trio left the Atrium and headed for the Lake Club, also in Springfield. Plaintiff said he and Pierson each drank an additional beer from the cooler during the short drive to the Lake Club and about three more beers after they arrived.

While there, Coats became involved in an altercation with some other patrons. The confrontation escalated and a group of people, one of whom was Coats, ended up outside in the parking lot. Police were summoned and Coats was arrested for his involvement in the scuffle. After police took Coats to jail, plaintiff and Pierson discovered they had the keys to Coats' truck. They left the Lake Club, with plaintiff driving, and stopped at a nearby Huck's convenience store where plaintiff made a few phone calls and then "got sick." Pierson took over as driver as the pair left the gas station and headed toward Beardstown.

Coats, in his deposition, testified the parties drank no alcohol between Beardstown and Jacksonville, but the parties did get beer in Jacksonville, although he could not remember who bought it or from where. Coats said he drank about two beers between Jacksonville and Springfield from the cooler in the back of the truck, retrieving the beers through a sliding window, but he could not recall how many beers plaintiff and Pierson drank. Coats said he had about four or five beers while at the Atrium but could not recall how many drinks plaintiff and Pierson consumed there. He surmised the trio took turns buying rounds for each other, although he could not remember specifically. Similarly, Coats said the trio continued to drink after arriving at the Lake Club but did not know how many drinks they had individually. Coats remembered getting into a fight at the Lake Club with the bouncer and some other individuals. Shortly after the fight erupted, the police arrived and arrested Coats, removed his truck keys from his pants pocket, and placed him in the back of the squad car before taking him to jail. Coats did not know how plaintiff and Pierson got possession of his truck keys.

Pierson testified the trio left Beardstown in Coats' truck and headed to the Headquarters bar in Jacksonville, where the parties stopped but then left without ordering a drink because there were "no girls" around. Because the group was using Coats' truck, Pierson

indicated Coats was the "designated driver" and only had a "few" beers throughout the evening. Pierson said he noticed a cooler in the truck bed with at least six beers inside but did not drink any. Pierson further explained there was no way to reach the cooler from the cab without stopping the truck and exiting the cab. In addition, Pierson said he did not drink any beer from the cooler during the ride from Jacksonville to the Atrium bar in Springfield. While at the Atrium, Pierson testified he drank three or four beers and one or two shots of "liquid cocaine," as the parties took turns buying "rounds." After about two hours, the parties left and drove to the Lake Club bar. During the drive to the Lake Club, Pierson said he drank part of one beer from the cooler in the truck. The parties continued to drink at the Lake Club, with Pierson consuming another two or three beers. Later, an altercation ensued in the parking lot between Coats and the Lake Club's bouncer, for which police later arrested Coats. As the police were driving away with Coats, Pierson said plaintiff showed up with the keys to Coats' truck. With plaintiff driving, the pair drove to a nearby Huck's convenience store, during which Pierson said he drank part of another beer from the cooler in the truck. While at Huck's, Pierson said plaintiff "got sick," so Pierson decided to drive. After traveling less than 10 miles, Pierson fell asleep behind the wheel and ran off the road, causing the truck to hit a culvert and jettison into two nearby trees.

In March 2000, defendants moved for summary judgment, arguing plaintiff's complicity in procuring Pierson's intoxication barred plaintiff's recovery under the Dramshop Act. The trial court agreed and, in June 2000, by docket entry, it awarded summary judgment to defendants, concluding the evidence "overwhelmingly established plaintiff's voluntary participation in the drinking activities" and, thus, established the defense of complicity. This appeal followed.

## II. ANALYSIS

■ Plaintiff argues the trial court erred as a matter of law by awarding summary judgment to defendants. We review a trial court's order granting summary judgment under the *de novo* standard. *Segers v. Industrial Comm'n*, 191 Ill. 2d 421, 428, 732 N.E.2d 488, 493 (2000). Specifically, plaintiff argues the evidence presented in this case does not establish plaintiff's complicity in procuring Pierson's intoxication on the night of the accident. We agree.

■ When a person is injured by an intoxicated individual, the injured party has a statutory right of action for limited damages against the dramshop that provided the alcohol to the intoxicant. 235 ILCS 5/6—21(a) (West 1996). The Dramshop Act's intent is to place

responsibility for damages caused by intoxicants on those who profit from the sale of alcohol; its language should be liberally construed to protect the health, safety, and welfare of the people from the dangers of traffic in liquor. *Walter v. Carriage House Hotels, Ltd.*, 164 Ill. 2d 80, 86-87, 646 N.E.2d 599, 602 (1995).

■ The complicity doctrine is a judicially created affirmative defense to the statutory liability imposed by the Dramshop Act upon those businesses selling liquor. *Walter*, 164 Ill. 2d at 86, 646 N.E.2d at 602. To establish the defense, the defendant dramshop must plead and prove by a preponderance of the evidence the "plaintiff's conduct *actively contributed to or procured* the inebriate's intoxication." (Emphasis in original.) *Walter*, 164 Ill. 2d at 95, 646 N.E.2d at 606. This standard is not akin to contributory negligence, which relates to the plaintiff's role in causing his own injury; rather, complicity concerns the plaintiff's role in causing the inebriate's intoxication. *Walter*, 164 Ill. 2d at 89, 646 N.E.2d at 603-04.

■ In trying to determine what constitutes "actively contributing to or procuring" another's intoxication, some courts have erroneously characterized complicity as plaintiff's "willing encouragement" of or "voluntary participation" in the drinking activities that led to the inebriate's intoxication. *Walter*, 164 Ill. 2d at 91, 646 N.E.2d at 605. Other courts have placed too much emphasis on such things as whether the plaintiff and the intoxicant were "bar-hopping" or whether plaintiff was buying "rounds" of drinks. *Walter*, 164 Ill. 2d at 95, 646 N.E.2d at 606. Such definitions blur the distinction between actively causing another's intoxication and merely providing social companionship to the intoxicant. *Walter*, 164 Ill. 2d at 91, 646 N.E.2d at 604-05. Because a plaintiff's complicity depends on the specific facts of each case, the fact finder is generally the proper body to determine whether sharing an evening of drinking with the intoxicant rises to the level of complicity. *Walter*, 164 Ill. 2d at 92, 646 N.E.2d at 605. While a trial court may, under appropriate circumstances, award summary judgment, it should only do so when the material facts establishing plaintiff's procurement of the inebriate's intoxication are undisputed and capable of only one conclusion. *Walter*, 164 Ill. 2d at 95, 646 N.E.2d at 606.

■ In the present case, the trial court erred by awarding summary judgment to defendants. While we agree plaintiff "actively participated in the drinking activities" on the night of the accident, this does not necessarily rise to the level of complicity for purposes of the Dramshop Act. The evidence in this case establishes three friends went to three bars together, drank beer and liquor, bought "rounds" of drinks for each other, and, after becoming intoxicated, the two not arrested suf-

fered an automobile accident while driving home. According to their testimony, the friends dispute (1) who purchased the cooler of beer and put it in Coats' truck, (2) to what extent they drank during the ride to Springfield, (3) the extent to which the parties bought drinks for each other at the Atrium and the Lake Club, and (4) how much alcohol the parties consumed during the evening, individually or as a group. Because these material facts are in dispute and are capable of more than one interpretation, the trial court should have left the question of complicity to the fact finder's interpretation.

## III. CONCLUSION

For the reasons stated, we reverse the trial court's award of summary judgment for defendants and remand for further proceedings.

Reversed and remanded.

McCULLOUGH and MYERSCOUGH, JJ., concur.